## Salem and South Danvers Railroad Company *vs.* County Commissioners of Essex.

A writ of *certiorari* will not be issued to quash the proceedings of county commissioners in determining the amount of compensation to be paid by a street railway company for extending their track over a bridge, the title to which has become vested in the Commonwealth by the expiration of the franchise of the corporation which built it, because at the hearing they cited towns interested in the subject to appear before them, and also listened to suggestions from private persons; especially if no objection thereto was made at the time of the hearing.

If county commissioners are authorized by statute to determine the amount of compensation to be paid by a street railway company for extending their track over a bridge, without

any provision whether they should fix upon an annual or a gross sum, their determinatior fixing upon an annual sum will not be quashed, by a writ of *certiorari ;* especially if it appears to this court to have been a just determination.

The *St.* of 1863, *c.* 97, authorizes the county commissioners of Essex, in determining the amount of compensation to be paid by the Salem and South Danvers Railroad Company for extending their railway over Essex Bridge, to fix a different sum from that established by *St.* 1859, *c.* 122, § 2, as tolls for coaches; and also to include therein a sum to be paid to the agent of the Commonwealth for services rendered necessary by the extension of the railway over the bridge.

BILL IN EQUITY, setting forth that by *St.* 1863, *c.* 97, the plain· tiffs were authorized to extend their railroad over Essex Bridge, and the county commissioners of Essex were authorized, upon a proper application, to fix and determine the manner of construc· tion of such railroad over the bridge; that by *St.* 1859, *c.* 122, § 2, it was provided that the tolls on said bridge for each coach which crosses the same as often as five times daily, and is used for the purpose of carrying passengers for hire, shall be four cents for each trip; that pursuant to the authority conferred by *St.* 1863, *c.* 97, they presented a petition to the county commis- sioners of Essex, who caused notice thereof to be served upon the governor of the Commonwealth, and a time and place were fixed for the hearing, at which the Commonwealth were repre- sented, and the county commissioners also requested and per mitted persons not under oath, residing in different towns in Essex county, to state what they understood to be the desire of the inhabitants of their several towns in regard to an assessment of tolls, in order to establish a fund for the support of the bridge, and to urge the expediency of so arranging the tolls that the citizens of several towns should derive an indirect advantage from the imposition of high tolls upon the plaintiffs, and that *St.* 1859, *c.* 122, was improvidently passed, and should be disre- garded, and was peculiarly unjust to sundry small towns in the county; that by *St.* 1859, *c.* 122, the plaintiffs are authorized to drive their cars over said bridge at the rate of four cents for each trip, anything in *St.* 1863, *c.* 97, to the contrary notwithstanding; that no authority is given by *St.* 1863, *c.* 97, to the county com· missioners to levy a toll upon the plaintiffs for the enjoyment of the franchise now owned by the Commonwealth, but merely to determine the mode cf construction of the railroad track, and

what compensation should be made for the use of the physical structure called the Essex Bridge, according to the peculiar necessities of a horse railroad corporation ; that the county commissioners, in addition to determining such mode of construction, and the compensation to be paid for the use of such structure, determined that the sum of five hundred dollars should be paid annually by the plaintiffs, which payment is in the nature of a toll, and is excessive, and that a daily compensation of five dollars a day should be paid to the agent for services in superintending the repairs of the bridge.    The prayer was for a writ of *certiorari.*

The defendants in their answer set forth that *St.* 1863, *c.* 97, also provided that the county commissioners should fix and determine what compensation should be paid to the Commonwealth for the use of Essex Bridge ; that the plaintiffs applied to the defendants to fix and determine the mode of constructing their railway upon and over the bridge, and also the compensation to be paid for the use thereof; that the defendants gave notice to the governor, and also caused notice to be published in a newspaper, stating the time, place and object of the meeting to be had by them, and requesting towns interested to be represented before them ; that at the hearing the defendants heard all parties appearing in interest, certain individuals, who claimed to speak in their own behalf, as citizens of the county and Commonwealth, expressing their views upon the question of compensation ; that at said hearing, no person was requested to or did urge the expediency of so arranging the tolls that the citizens of several towns should derive an indirect advantage from the imposition of high tolls, or that *St.* 1859, *c.* 122, was improvidently passed and should be disregarded, and was unjust to sundry towns, but only that the defendants should require of the plaintiffs a fair and just compensation, equalizing, as far as the circumstances wou'd justify, the burden of supporting said bridge among all who should use it; that, whatever views may then have been expressed by others, the defendants endeavored to exercise their own best judgment in the premises, and, upon agreed or established facts, and governed only by legitimate

conclusions, established the compensation which the plaintiffs should pay at a rate which they believed to be liberal towards the plaintiffs, and just and right; that *St.* 1859, *c.* 122, § 2, does not apply to street railway cars, and, if it did, is controlled by *St.* 1863, *c.* 97 ; that the sum determined upon for the plaintiffs to pay was only one fourth of the ordinary and contemplated expenses of keeping the bridge in repair; that there is an agent of the bridge for the Commonwealth, whose sole duty it is, by law, to take charge of, manage and repair the bridge, and the defendants properly provided that said agent should have the general supervision thereof, and that for his services the plaintiffs should pay him a fair compensation, and not throw upon the Commonwealth the cost of work done exclusively for the benefit of the plaintiffs; and that the agent's bill to this time has been but seventy-five dollars. There were also other averments, not now material.

The case was reserved on the bill and answer for the determination of the whole court.

*S. H. Phillips*, for the plaintiffs.

*Foster, A. G.*, for the defendants.

BIGELOW, C. J. The petitioners fail to show any essential error or mistake in the doings of the commissioners set out in the petition, or any sufficient reasons for causing the record to be certified to this court for revision or correction. .

1. The first alleged error is, that the commissioners permitted certain persons not regularly parties to the proceeding to appear before them at the hearing of the subject matter on which they were authorized to adjudicate, and to make statements and arguments concerning the compensation which the petitioners ought to pay for the use of the bridge by the railroad which they were empowered to construct over it. We are by no means clear that this action was not within the fair scope of the power intrusted to the commissioners, and necessary and proper to enable them to discharge the duties imposed on them intelligently and impartially. It is doubtless true that the legal title to the structure of the bridge in question is vested in the Commonwealth, who can alone exercise the powers originally granted

to the corporation by which the bridge was built, and that in a strict and technical sense the Commonwealth was the adverse party to the proceeding which the petitioners had instituted before the commissioners. But it is equally true that the Commonwealth had but little if any beneficial interest in the bridge and franchise. These were not held by the Commonwealth for the purpose of raising revenue to replenish the general treasury of the state, or to be used for the ordinary expenditures of the government. The legislature had a very different object in view in authorizing the governor and council, by *St.* 1858, *c.* 108, § 1, to accept from the original proprietors a delivery of the bridge, and in assuming the care and control of it, as provided by said act. The property was taken in trust only for the purpose of raising a fund by the accumulation of which from the receipt of tolls the bridge might be kept in repair and eventually made free. This is the declared object of the provisions in §§ 5 & 6 of the statute cited. The *cestuis que trustent* are the people of the Commonwealth, especially those who reside in towns in the vicinity of the bridge, and who have most frequent occasion to use it. The inhabitants of these towns are beneficially interested in the franchise and structure, and it is a matter of special concernment to them that the bridge should be kept in a condition safe and convenient for travel, and that a suitable compensation for the use of it by the railroad corporation should be fixed, in order to secure the speedy accumulation of the trust fund contemplated by the statute. In this view, it can hardly be said that the commissioners exceeded their authority or committed an error in giving notice to all persons interested to appear before them, and in allowing the adjacent towns or individuals residing in the vicinity to make statements and suggestions pertinent to the subject matter on which the commissioners were to adjudicate.

But assuming that this course of proceeding was extra-judicial and erroneous, it affords no sufficient ground for setting aside the action of the commissioners. Not only is there an entire want of evidence to snow that any undue or improper influence was exerted on the minds of the commissioners by the

intervention of parties other than the Commonwealth, or that any injustice was thereby occasioned; but it does not appear that the petitioners raised the objection upon which they now insist at the time of the hearing, or interposed any suggestion that the action of the commissioners was irregular or erroneous. Such being the fact, it is too late now to urge it as a ground for quashing the proceedings. If the petitioners intended to avail themselves of the objection, good faith and fair dealing required that it should be taken in season to enable the adverse party or the commissioners to correct or avoid the error.

2. The second alleged error is, that the commissioners exceeded their authority in adjudicating that the petitioners should pay a certain annual sum for the use of the bridge, instead of estimating and determining the amount at a gross sum, the payment of which should be in full of the compensation which the commissioners were authorized to award by *St.* 1863, *c.* 97, § 5. The answer to this is twofold. The first and comprehensive one is, that the power of the commissioners is wholly unrestricted. The legislature put no limitation whatever on their authority. The whole subject of compensation, both as to amount and the mode in which it should be paid, was committed to them by the express terms of the statute. The other answer is, that the authority given to the commissioners was wisely and discreetly exercised, and in a manner most for the interest and advantage of the petitioners. The compensation which the petitioners ought justly to pay would depend very much on the length of time which would elapse before the bridge would become free by the accumulation of the fund necessary to keep the bridge in repair, and also on the period during which the bridge might be used by the petitioners. The award of a gross sum based on estimates and calculations necessarily conjectural and uncertain might be excessive and disproportionate, especially if the bridge should be made free sooner than might reasonably have been anticipated when the award was made, or in the event that the petitioners should see fit at any future time to discontinue the use of the bridge. In view of these and similar contingencies, a compensation fixed at an

annual sum, payable quarterly, seems to be more just and reasonable, and better adapted to the peculiar nature of the property, than a gross sum which the petitioners would have been bound to pay presently. The former is open to revision and modification by the legislature, if it shall be found to be excessive or disproportionate ; the latter, when once paid, would be final and irrevocable, although it might prove to have been much greater than the petitioners ought equitably to pay for the use of the bridge. In this matter, therefore, we are of opinion that the commissioners neither exceeded their authority, nor exercised it indiscreetly or unjustly.

3. The next objection urged to the validity of the proceedings is, that the commissioners had no power to award that the petitioners should pay for the use of the bridge by their cars any other sum than that established by *St.* 1859, *c.* 122, § 2, as tolls for coaches which cross the bridge as often as five times daily, and are used for the purpose of conveying passengers for hire. The answer to this objection is obvious. The commissioners had full power, not only to prescribe the mode in which the petitioners should construct their railroad over the bridge, but also the compensation which they should pay for the use of the structure. This clearly comprehended payment for the appropriation of a portion of the bridge for the track of the railroad, and also the use of that part for the passage of cars. It was the entire privilege or franchise granted to the petitioners out of that which originally belonged to the proprietors of the bridge, and which had become vested in the Commonwealth, for which the commissioners were to award a compensation. No right to demand or receive tolls from the petitioners was intended to be reserved or retained by the Commonwealth. To the extent to which the railroad corporation might occupy and use the bridge with their superstructure and with the cars which passed over it, the right to take tolls was surrendered, and in the place thereof the commissioners were authorized to determine the sum which should be paid for such surrender by the petitioners.

4. The fourth and last ground on which it is alleged that the doings of the commissioners were erroneous is, that they

included in their award of compensation a certain sum to be paid to the agent of the Commonwealth for his services during the time that he might be employed in the care and superintendence of the bridge, rendered necessary by the construction of the railroad of the petitioners over the bridge and the use of it by them for the transportation of passengers. But this was clearly within the scope of the power given to the commissioners. Such care and superintendence were necessary, and the expense thereof was properly embraced in the compensation which the commissioners were authorized to award, and which the petitioners were bound to pay.          *Petition dismissed.*